United States District Court
Southern District of Texas
**ENTERED**
January 19, 2023
Nathan Ochsner, Clerk

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS GALVESTON DIVISION

No. 3:21-cv-310

ZACHARY FOYT, TDCJ #2183565, *PETITIONER*,

v.

BOBBY LUMPKIN, *RESPONDENT*.

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE*.

The petitioner, Zachary Foyt, seeks federal habeas corpus relief from his state-court murder conviction from Brazoria County, which resulted in a sentence of lifetime imprisonment in the Texas Department of Criminal Justice – Correctional Institutions Division. He has filed a petition and a memorandum in support of his request for relief, which is governed by 28 U.S.C. § 2254. Dkts. 1, 2. The respondent has answered with a motion for summary judgment, arguing that Foyt is not entitled to relief under the demanding federal habeas corpus standard of review. Dkt. 24. Foyt has filed more than one response. Dkts. 31, 35, 38. He has also filed several motions. Dkts. 29, 30, 32, 33.

After reviewing all of the pleadings and the applicable law, the court will grant the respondent's motion for summary judgment and dismiss this case.

## I.  <u>BACKGROUND</u>

Unless otherwise indicated, the facts in this section are taken from the petition, Dkt. 1, the petitioner's supporting memorandum, Dkt. 2,[1] and the state-court records provided by the respondent.  Dkts. 25-28.

At a trial in the 239th District Court for Brazoria County, the state presented evidence that Foyt murdered a man named Jubal Dee Alexander, whose badly decomposed, decapitated body was found in a pickup truck under a bridge near the Austin Bayou boat ramp on May 3, 2016.  Alexander's head was never found. Foyt's former girlfriend, Lauren Cano, testified that Foyt admitted killing a man near the water by shooting him and then cutting his head off with a knife to hide the ballistics evidence.  Foyt then fled to Colorado.  The state presented additional evidence of Foyt's guilt, including inculpatory text conversations and cellphone tower records that placed Foyt in the area of the boat ramp where Alexander's headless body was discovered.  A jury found Foyt guilty of killing Alexander as charged in Brazoria County Case No. 79248-CR and sentenced him to life imprisonment.

On direct appeal Foyt's appellate counsel raised seven points of error,

---

[1] The court notes that Foyt has supplemented his supporting memorandum by providing a paragraph that was not scanned completely into the court's electronic-case-filing system ("ECF").  Dkt. 30 at 1-2 (providing a paragraph missing from the memorandum, Dkt. 2 at 8).  Foyt's motion to take judicial notice of the scanning error and the contents of the missing paragraph, Dkt. 30, is granted.

including an argument that there was insufficient evidence to prove that Foyt was

the murderer.  Foyt filed a supplemental *pro se* brief which also raised an argument

that there was insufficient evidence to establish his identity as the person who

killed Alexander or to connect him with the offense.  The court of appeals rejected

those arguments and affirmed the conviction in a published opinion, which set

forth the extensive evidence presented against Foyt in detail:

> Jubal Alexander had finished the night shift at his job in Chocolate Bayou, Texas on April 27, 2016. He went to the gym that morning. Afterward, he parked his truck under a bridge near a boat ramp not far from the plant where he worked. He had been showering at the gym and sleeping in the truck so he could save money to send home to his girlfriend in Port Arthur. After 9:19 a.m., there was no outgoing activity from Alexander's cell phone. No one heard from Alexander again.

> Meanwhile, appellant had no outgoing activity on his cell phone from 11:49 a.m. until 2:23 p.m. that day. Cell phone tower records, though inexact, placed appellant in the area surrounding the boat ramp during that timeframe. Appellant had texted his grandmother at 9:38 a.m.: "decided not to show up for work today." Work records corroborated that appellant did not work on April 27 or 28.

> Appellant had a friend, nicknamed Sparky, who lived near the boat ramp. Appellant called Sparky on April 30 but apparently did not reach him. Appellant followed up with a text: "I was just calling for some [advice;] been thinking and an idea occurred[;] thought to shoot it by you first." Appellant was supposed to help his dad with a crawfish boil that night and invited Sparky, but Sparky was in Angleton. Appellant texted, "Alright[,] come over [to] my place[;] I'll tell you more." Appellant's dad later asked appellant, "Where are you[,] you still coming?" Appellant responded, "Sorry I had something come up." After an outgoing phone call to Sparky at 9:12 p.m., appellant's cell phone records showed no activity until 12:45 a.m. on May 1.

> Appellant started texting his ex-girlfriend, Lauren, at 12:51 a.m.:

- "Hey was just wanting to say goodbye. I'm planning on leaving for good."

- "I'll be fine but it's something I did I can't say for I feel you may even look at me different."

- "I'm not staying to burn."

In the morning, Lauren's father, Laurence, was awakened by his wife. Something she said made him concerned about appellant. At the time, appellant was renting an apartment from Laurence. Laurence went to see him. When Laurence arrived, he noticed appellant was packing to leave. Appellant told Laurence he was going to sell his possessions and move to Colorado because "he did something but he couldn't [say] what it was." Appellant showed Laurence some letters he had written to his family members in which he referenced "giving his stuff away." Laurence became even more worried for appellant and kept checking on him throughout the day.

The next day, appellant went to see Lauren's mother, Frances. He told her that he had done something wrong, "he had a lot of demons he needed to go release," and if he stayed in the area, "he would hurt other people he loved." Frances, not knowing any details about what appellant had done and thinking "maybe he might have beat somebody up really bad," suggested he should go to Colorado to make a fresh start.

Lauren texted appellant on May 3, asking why he had to leave. He responded, "[T]he reason is bad enough," and "I couldn't tell . . . you what I did but when it's found out it's more likely going to be on the news." Lauren had a feeling at that point that appellant had hurt someone and asked why he "did it," to which he responded, "Because it felt good." Later that day, Lauren texted, "Maybe what you did isn't so bad." Appellant said, "It is." Lauren asked if appellant broke the law, and he said, "[Y]es I did."

Two minutes later, Lauren called appellant. According to Lauren, appellant told her that he found someone in a truck by the water and shot him in the head. Appellant also said the man was around his age and the truck had a Mississippi license plate. After he talked to a friend with a weird nickname about "what to do about the

bullet," appellant reported that he returned to the scene "[l]ike a day" later and beheaded the man with a knife to hide ballistic evidence. There was a bad smell because the body had been decomposing. Appellant told Lauren he was planning to flee to Colorado.

The same day, Alexander's decapitated body was discovered in the truck near the boat ramp. By that point, his body had been decomposing in the Texas heat for six days. Alexander and appellant were both 24 years old at the time of the murder. The truck had Mississippi license plates—Alexander had purchased it in that state but had not transferred the title. Alexander's head was never found.

The medical examiner classified Alexander's death as "homicidal death by unknown means with . . . postmortem decapitation." A forensic anthropologist determined that the decapitation occurred when there was still soft tissue on the bones and likely it took two to four hours to behead Alexander. She concluded that a knife with a very thin blade was used.

No DNA evidence other than Alexander's DNA was recovered from the scene of the crime. This was not surprising, given the state of decomposition of the body. Even Alexander's DNA was difficult to retrieve because of the condition of his body. The conditions were also consistent with the scene having been cleaned and evidence having been destroyed. No bullet casings were found on the scene, but a .38 caliber bullet was recovered from the passenger side door panel of the truck.

Lauren also said she met appellant at his apartment on Mother's Day. Appellant told her the man clung to life after appellant shot him—he had "gasped and wanted to live."

Appellant had a garage sale around this time and sold almost all his possessions for $300 to the person who would be moving into the apartment. Appellant told her that he was moving to Colorado. He left behind clothes and photographs of himself and others hanging on the wall.

Officer Kincheloe received a phone call on May 24 regarding a lead in the case. That day, Kincheloe and his partner interviewed Laurence and Frances together and then Lauren. Information provided by Lauren was consistent with information not disseminated

to the public, including the fact that Alexander's truck had Mississippi license plates. Appellant became the sole focus of the investigation.

While these events were ongoing, a young man named Chevy lived with Sparky. At some point, Sparky showed Chevy the barrel of a gun that he had been hiding under his couch cushion. Sparky nervously told Chevy that he and appellant had done something with the gun. Several Google searches had been made on Chevy's phone the evening of April 27 for "forensic gun ballistics," and an internet article entitled "6 Remarkable Ways Guns Can Be Linked to a Crime Scene" had been accessed. The Wikipedia page for "Ballistic fingerprinting" had also been accessed as well as the website forensicoutreach.com. Chevy denied performing the searches but said that he had allowed Sparky to use his phone on several occasions. Chevy did not think the phone was password protected (it was), but said that if it had been, Sparky would have had the password. Chevy had a .38 caliber pistol, a 9-millimeter pistol with two magazines, and a 9-millimeter bullet in a storage unit.

Officers Nichols and Velez went to Colorado on June 8 to locate appellant. The same day, Detective Lee and Agent Griffith from Colorado were conducting surveillance on appellant. Griffith observed appellant coming out of his apartment building. He "look[ed] around as if he [were] being watched, looking for anybody." Griffith noted appellant's behavior was unusual. Appellant was carrying a banana, which he then held out as if it were a handgun. Griffith testified, "He [brought the banana] up, look[ed] down his arm, and then [did] this (indicating) as if he were doing a double tap. You got two recoils." The banana was pointed at the back of a car. Appellant then laughed and walked to his car. He drove his car to another parking spot, got out, walked around some buildings, then came back, got back into his car, and drove away.

Nichols and Velez found appellant two days later in the parking lot of his apartment complex. He agreed to go with them to a local police station for an interview. The three rode in the officers' rental car, and the officers took appellant's keys and his phone. During the interview, appellant said he moved to Colorado for a job. According to him, he did not own any knives. He acknowledged that he had purchased a 9-millimeter handgun from Academy on February 3 but told the officers that he sold the gun to a large, hairy man in a bar in late February to pay his rent. He denied telling Lauren he had done

"something bad" but later told the officers he wanted to go to Colorado when "it" happened. He refused to explain what "it" meant and denied any involvement in the murder. Immediately following the interview, an arrest warrant was issued in Brazoria County, and appellant was arrested in Colorado.

Two other phones and three knives were found in appellant's car. A yellow notebook was also in the car containing handwritten information regarding how "[t]o get new identity" and a list with someone's name, an identification number, a date of birth, a Social Security number, and an address. A list of phone numbers was handwritten on another page, including numbers for Lauren, Laurence, Frances, Sparky, and Chevy.

Police officers also interviewed Sparky on June 10. Three days later, the officers went to Sparky's house and executed a search warrant. They located a box of latex gloves in Sparky's bathroom, a crushed cell phone, a rusted gun, a bullet that may have been the same caliber as the one used in the crime, and several knives. No information could be retrieved from the crushed cell phone. Sparky also had a newer cell phone with records that did not begin until May 14. Officers took a shop vac from Sparky's living room that contained metal shavings. Sparky ultimately turned over a grinder and a box of bullets. Officers were concerned that the grinder had been used to destroy the murder weapon. Sparky was charged with the crime of tampering with evidence.

Similar latex gloves were found in Alexander's truck, outside the truck in a nearby field, in appellant's glovebox, and in Sparky's house. The murder weapon was never recovered, but the handgun appellant had purchased could fire the type of ammunition recovered from the passenger side door panel of the truck. The recovered bullet was eliminated as having been fired from any of the guns taken from Sparky or Chevy.

*Foyt v. State*, 602 S.W.3d 23, 32-35 (Houston [14th Dist.] 2020, pet. ref'd). Foyt also challenged the sufficiency of the evidence in a petition for discretionary review, which the Texas Court of Criminal Appeals refused.

Foyt next sought collateral review of his conviction by filing a state habeas

corpus application under Article 11.07 of the Texas Code of Criminal Procedure. Foyt argued that he was entitled to relief because his trial counsel failed to conduct an adequate pretrial investigation by interviewing Lauren Cano, who was the state's main witness against him.  Foyt argued further that his appellate attorney failed to adequately brief his claim that the evidence was legally insufficient to establish his guilt.  After considering affidavits from Foyt's attorneys, the state habeas corpus court, which also presided over the trial, entered findings of fact and concluded that Foyt was not entitled to relief because he failed to show that his counsel was constitutionally ineffective.  The Texas Court of Criminal Appeals agreed and denied relief without a written order based on the trial court's findings and its own independent review of the record.

Foyt now seeks review of his murder conviction under 28 U.S.C. § 2254. Foyt argues that he is entitled to federal habeas corpus relief for the following reasons, which were addressed on direct appeal and during his state habeas corpus proceeding:

1. The evidence was legally insufficient to establish his presence during the commission of the offense.

2. His trial counsel failed to interview the state's primary witness, Lauren Cano.

3. His appellate attorney failed to properly argue his claim that the evidence was legally insufficient to support the conviction.

Dkt. 1 at 5, 7, 8.  Noting that all three claims were rejected on the merits in state court, the respondent argues that Foyt fails to show that he is entitled to relief

under the deferential standard of review that applies to federal habeas corpus petitions governed by 28 U.S.C. § 2254. Dkt. 24. Foyt has filed a response and two supplements. Dkts. 31, 35, 38.[2] Foyt has also filed a motion for an evidentiary hearing, Dkt. 32, which will be denied for reasons provided below.

## II.    <u>STANDARD OF REVIEW</u>

The respondent has filed a motion for summary judgment, which is ordinarily governed by Rule 56 of the Federal Rules of Civil Procedure. But in a case like this, the Federal Rules of Civil Procedure apply only to the extent that they are consistent with the statutory provisions and rules governing federal habeas proceedings. *See* Rule 12, Rules Governing Section 2254 Cases in the U.S. District Courts; *see also Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000); *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *abrogated on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

A state prisoner is required by the federal habeas corpus statutes to exhaust all available state-court remedies before seeking review in federal court. *See* 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999). Claims that

---

[2] Foyt filed a motion for an extension of time to respond and a motion for additional time in the prison law library. Dkts. 29, 33. The record reflects that Foyt has filed more than one response to the motion for summary judgment and that these submissions are supported with authority and citations to the state-court record. Dkts. 31, 35, 38. Because Foyt represents himself, the court has reviewed all of his submissions under the lenient standard that applies to *pro se* pleadings. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam). Therefore, these motions, Dkts. 29 and 33, will be denied as unnecessary.

have been properly raised and adjudicated on the merits in state court are subject to the legal standard found in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d), which bars relitigation of such claims unless certain narrow criteria are met. *See Harrington v. Richter*, 562 U.S. 86, 98 (2011). In that regard, a federal court may not grant habeas relief in favor of a state prisoner unless the petitioner shows that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts" in light of the state-court record, 28 U.S.C. § 2254(d)(2). *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

"A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Matamoros v. Stephens*, 783 F.3d 212, 215 (5th Cir. 2015) (citations omitted).   To constitute an "unreasonable application of" clearly established federal law, a state court's holding "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (citation omitted).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood

and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Richter*, 562 U.S. at 103).

The Supreme Court has emphasized that 28 U.S.C. § 2254(d) "imposes a 'highly deferential standard for evaluating state-court rulings, . . . [which] 'demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).  A state court's findings of fact are "presumed to be correct" unless the petitioner rebuts those findings with "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  A federal habeas corpus court "may not characterize these state-court factual determinations as unreasonable 'merely because [it] would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 576 U.S. 305, 313-14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).  "Instead, § 2254(d)(2) requires that [a federal court] accord the state trial court substantial deference."  *Id.*

## III.   <u>DISCUSSION</u>

### A.   **Sufficiency of the Evidence**

Foyt's primary claim is that there was insufficient evidence to support his murder conviction because the state did not prove the time or place of the victim's death and there was no physical evidence or eye-witness testimony connecting Foyt to the offense.  Dkt. 1 at 5.  Foyt argues that the state presented only "speculative" evidence that did not "coincide" with or corroborate testimony given by Lauren Cano.  *Id.*  Therefore, Foyt insists that the prosecution failed to connect

him to the crime or prove all elements of the offense beyond a reasonable doubt. *Id.*; Dkt. 2 at 3-7.

Challenges to the legal sufficiency of a state-court conviction are governed by *Jackson v. Virginia*, 443 U.S. 307 (1979), and the federal constitutional due-process standard. *See In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."). Under this standard a reviewing court need only determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original).

The Supreme Court has explained "that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam). First, the *Jackson* standard that applies on direct appeal makes clear that

> it is the responsibility of the jury — not the court — to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.

*Id.* (citation and internal quotations omitted). And second, the AEDPA standard that applies on habeas review mandates that "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because

the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* (citations and internal quotation omitted). When applied together, *Jackson* and the AEDPA standard require a "double dose of deference that can rarely be surmounted." *Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011).

This doubly deferential review focuses on the last reasoned state judgment that considered and rejected the petitioner's federal claim. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, — U.S. —, 138 S. Ct. 1188, 1193-94 (2018). The last reasoned judgment to address Foyt's challenge to the sufficiency of the evidence is from the intermediate state court of appeals, which set forth the facts detailed above and concluded that there was more than sufficient proof to support the jury's guilty verdict under the *Jackson* standard:

> When reviewing sufficiency of the evidence, we view all the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational factfinder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979)). We do not sit as a thirteenth juror and may not substitute our judgment for that of the factfinder by reevaluating the weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Rather, we defer to the factfinder to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic to ultimate facts. *Id.* This standard applies equally to both circumstantial and direct evidence. *Id.* Each fact need not point directly and independently to the appellant's guilt so long as the cumulative effect of all incriminating facts is sufficient to support the conviction.

*Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

As correctly set forth in the charge to the jury, a person commits murder if he "intentionally or knowingly causes the death of an individual" or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code § 19.02(b). Appellant concedes that Lauren's testimony "shows that Appellant intentionally and knowingly caused the death of Alexander" but contends that the lack of other evidence incriminating appellant "overwhelmingly outweighs" the evidence of his guilt.[3] Appellant similarly complains in his *pro se* brief that Lauren's testimony "only leads to a suspicion of guilt."

We do not weigh the credibility of Lauren's testimony: that job belonged solely to the factfinder.[4] *See Isassi*, 330 S.W.3d at 638; *see also McIntyre v. State*, No. 14-13-00407-CR, 2014 WL 6602420, at *6 (Tex. App.—Houston [14th Dist.] Nov. 20, 2014, no pet.) (mem. op., not designated for publication) ("As an initial matter, appellant's credibility attacks cannot support reversal because we do not re-evaluate the jury's credibility determinations on appeal."). Applying the proper sufficiency standard and deferring to the factfinder's credibility determination, as we must, we turn to whether a rational factfinder could have found beyond a reasonable doubt that appellant murdered Alexander.

Alexander was never heard from again after 9:19 a.m. on April 27. The same day, appellant told his grandmother at 9:38 a.m. that he had decided not to go to work, and indeed he did not go to work. He was off his cell phone from 11:49 a.m. until 2:23 p.m., and during that

---

3 Under the legal sufficiency standard, although we consider all the evidence presented, we do not reweigh it. *See Gear*, 340 S.W.3d at 746.

4 Appellant argues that testimony from Lauren and her family was not credible because (1) Laurence asked if there was a Crime Stoppers reward and asked to be removed from the sex offender registry in exchange for information, and (2) Lauren initially withheld information regarding the Mother's Day meeting. The family still shared the information without receiving any benefit, and Lauren explained that she initially withheld information about the meeting with appellant because she did not want her husband to know about it. We presume the jury took this information into account in weighing the credibility of the evidence.

time, he was in the area where Alexander's body was found.

Appellant texted Lauren on May 1 that he was "planning to leave for good" because of "something he did" and he was "not staying to burn." Appellant also told Laurence and Frances he had done something wrong, so he was going to sell his possessions and leave town. Appellant told Frances he needed to leave to avoid "hurt[ing] other people he loved."

On May 3, appellant again texted Lauren, telling her the reason he had to leave town was "bad enough" and would "likely . . . be on the news." He said he did it "[b]ecause it felt good" and admitted he broke the law.

Lauren testified that she called appellant after he sent these texts, and phone records show that they had a lengthy phone conversation starting two minutes after appellant's last text. According to Lauren, appellant said a man around his age was in a truck with Mississippi plates by the water and appellant shot the man. Alexander was the same age as appellant, and his truck had Mississippi plates. Appellant told Lauren he went back "[l]ike a day" after talking to a friend with a weird nickname and beheaded the victim with a knife. The medical examiner classified Alexander's death as homicide with postmortem decapitation, so that finding was consistent with Lauren's testimony. Moreover, the forensic anthropologist testified that a knife was used to behead Alexander.

Phone records show that appellant sought advice from Sparky on April 30, invited Sparky to "come over," and after that, was off his phone that night for over three hours. Those records are consistent with Lauren's testimony that appellant told her he went back to the scene after talking to a friend with a weird nickname and that there was a bad smell from the decomposing body. The forensic anthropologist also testified that the victim was decapitated perimortem, meaning after death but "when there's soft tissue still on the bone."

Lauren said that appellant again confessed his crime to her on Mother's Day. Lauren provided information to the police about the crime that had not been disseminated to the public.

Around Mother's Day, appellant sold his possessions at a garage

sale for a nominal amount of money. He left behind personal items such as photographs and clothing. He moved to Colorado, which was consistent with the plans he relayed to Lauren and her parents. *See Balderas v. State*, 517 S.W.3d 756, 767 & n.16 (Tex. Crim. App. 2016) (noting that evidence of flight evinces consciousness of guilt).

The murder weapon was never found, but the State presented evidence from which the jury could have inferred that appellant might have destroyed it. Chevy testified that Sparky showed him the barrel of the gun and told him that he (Sparky) and appellant had done something with it. Sparky turned over a grinder to police. Police recovered metal shavings from Sparky's shop vac. *See Lily v. State*, 789 S.W.2d 433, 435 (Tex. App.—Houston [14th Dist.] 1990, no pet.) ("[D]estruction of evidence is probative of guilt."); *see also Martin v. State*, 151 S.W.3d 236, 244 (Tex. App.—Texarkana 2004, pet. ref'd) (same).

In addition, appellant's missing handgun could fire the type of ammunition found in the door of the victim's truck, and the recovered bullet had not been fired from any of the weapons obtained from Sparky or Chevy. Appellant admitted that he had owned such a handgun but told police officers that he sold it to a "heavyset, hairy guy" at a bar. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt."). The State was not required to produce the murder weapon to establish appellant's guilt. *See Tijerino v. State*, No. 14-06-01012-CR, 2008 WL 509880, at *6 (Tex. App.—Houston [14th Dist.] Feb. 26, 2008, no pet.) (mem. op., not designated for publication); *see also Delacerda v. State*, 425 S.W.3d 367, 382 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) ("Sufficient evidence can support a murder conviction even in the absence of physical evidence such as DNA evidence, fingerprinting evidence, and the murder weapon; thus, such evidence is not required to obtain a conviction."); *Harmon v. State*, 167 S.W.3d 610, 614 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) ("A rational jury could have found appellant guilty of aggravated robbery without DNA evidence, fingerprint evidence, or evidence of the gun . . . ."); *Craig v. State*, 783 S.W.2d 620, 624 (Tex. App.—El Paso 1989) (concluding evidence of murder was sufficient because defendant had a weapon at the time of the murder "consistent in calibre [sic] with the murder weapon" and then "fled and destroyed

his own pistol"), rev'd and remanded on other grounds, 825 S.W.2d 128 (Tex. Crim. App. 1992).

While under police surveillance in Colorado, appellant acted as if he thought he were being watched. He also mimicked shooting toward a car, while laughing, when he thought he was alone. During his police interview, he denied owning any knives, even though he had knives in his car, and denied having texted Lauren that he had done something bad, which was rebutted by the phone records presented at trial. *See Guevara*, 152 S.W.3d at 50 (making false statements to authorities can be probative of guilt). Appellant also said that he decided to go to Colorado when "it" happened. Although appellant did not confess to police what "it" meant, he confessed to Lauren.

In addition to the knives, police found two phones in appellant's car, along with a notebook containing information regarding how to get a new identity and someone else's identification number, birth date, Social Security number, and address. The notebook also contained phone numbers for Lauren, her parents, Sparky, and Chevy. Similar latex gloves were found in Sparky's house, appellant's car, Alexander's truck, and a field near the crime scene.

The lack of DNA evidence, according to the State's expert, was not surprising, given the state of decomposition of Alexander's body and given the evidence that appellant went back to the crime scene to destroy evidence. Physical evidence is not required to establish identity. *See Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986) ("Evidence as to the identity of the perpetrator of an offense can be proved by direct or circumstantial evidence."); *Delacerda*, 425 S.W.3d at 382 (noting DNA evidence was not required to establish elements of offense); *Harmon*, 167 S.W.3d at 614 (same); *Tinker v. State*, 148 S.W.3d 666, 669 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (holding despite lack of DNA evidence, complainant's testimony was sufficient to uphold conviction for aggravated sexual assault).

As to the evidence implicating Chevy, appellant pinpoints the Google searches that were conducted after the likely time of the murder on Chevy's phone regarding ballistics evidence. The jury was free to weigh this evidence and still conclude that appellant murdered Alexander. *See, e.g., Gilmore v. State*, No. 14-06-00620-CR, 2007 WL 2089294, at *5 (Tex. App.—Houston [14th Dist.] July 24, 2007, pet. ref'd) (mem. op., not designated for publication) (concluding evidence

in support of jury's robbery finding was sufficient because jury could disregard evidence regarding four other possible suspects); *Martin v. State*, 246 S.W.3d 246, 261 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (upholding murder conviction despite fact that defendant was "one of several other people who had the opportunity to injure" complainant); *Ates v. State*, 21 S.W.3d 384, 392-93 (Tex. App.—Tyler 2000, no pet.) (concluding circumstantial evidence was sufficient to support jury's murder finding because jury could have disregarded evidence of three other potential suspects as "weak and unpersuasive"); *Reeves v. State*, 969 S.W.2d 471, 479-80 (Tex. App.—Waco 1998, pet. ref'd) ("Reeves tried to raise questions regarding other potential suspects, but the jury, as the sole judges of the credibility of the witnesses and the weight to be given the evidence, could have disregarded his evidence as weak and unreliable.").

     We conclude the jury's murder finding is supported by legally sufficient evidence. This is not a case involving speculative evidence of appellant's guilt or conclusive evidence disproving appellant's guilt—appellant's conviction is based on testimony that the jury determined to be credible along with corroborating evidence. *See, e.g., McIntyre*, 2014 WL 6602420, at *6 (holding evidence in support of murder finding was legally sufficient when testimony was presented that defendant admitted to shooting complainant, purchased a gun before the shooting and sold it afterward, and was in vicinity of murder around time of killing); *Delacerda*, 425 S.W.3d at 382 (noting physical evidence was not required to convict); *Fisher v. State*, 851 S.W.2d 298, 304 (Tex. Crim. App. 1993) ("[T]estimony regarding appellant's oral confession was by itself sufficient evidence to warrant a rational finding of appellant's guilt of all the elements of the offense beyond a reasonable doubt."). We overrule appellant's first issue.

*Foyt*, 602 S.W.3d at 35-39 (footnotes renumbered from original).

     A state appellate court's findings of fact are entitled to the presumption of correctness unless the petitioner presents evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Sumner v. Mata*, 455 U.S. 591, 592-93 (1982) (per curiam) (observing that "the presumption of correctness is equally applicable when a state appellate

court, as opposed to a state trial court, makes the finding of fact"). Likewise, where a state court has thoughtfully reviewed the evidence and found it sufficient, that court's determination is entitled to "great weight" on federal habeas review. *See Parker v. Procunier*, 763 F.2d 665, 666 (5th Cir. 1985) (citation omitted); *see also Callins v. Collins*, 998 F.2d 269, 276 (5th Cir. 1993) ("Where a state appellate court has conducted a thoughtful review of the evidence . . . its determination is entitled to great deference.").

Foyt argues that the state failed to prove its case beyond a reasonable doubt because Lauren Cano's testimony "only draws a strong suspicion of guilt, yet is insufficient to convict." Dkt. 31 at 5. But Foyt's contention that Lauren's testimony was insufficiently corroborated or not credible was rejected by the jury and the state court of appeals, which conducted a thorough review under the *Jackson* standard and found ample evidence to corroborate Lauren's account. The record reflects that the state had a strong case against Foyt, as evidenced by the fact that it took the jury only two hours to convict following a two-week trial. Dkt. 26-13 at 15. A federal habeas corpus court may not substitute its view of the evidence for that of the fact-finder. *See Weeks v. Scott*, 55 F.3d 1059, 1062 (5th Cir. 1995). To the extent that Foyt invites this court to re-weigh the evidence and decide if the jury's decision was correct, this type of inquiry exceeds the scope of review permitted under the *Jackson* standard. *See Schlup v. Delo*, 513 U.S. 298. 330 (1995) ("[U]nder *Jackson*, the assessment of the credibility of witnesses is

generally beyond the scope of review."); *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005) (Under the *Jackson* standard "[a]ll credibility choices and conflicting inferences are to be resolved in favor of the verdict.").

Foyt has not refuted any of the state appellate court's findings and he does not show that its decision to reject his challenge to the sufficiency of the evidence was lacking in justification or erroneous in any respect. *See* 28 U.S.C. § 2254(d)(1)-(2). Because Foyt has not shown that the state court's decision was an objectively unreasonable application of the *Jackson* standard, he is not entitled to relief on his claim of insufficient evidence.

## B.    Ineffective Assistance of Trial Counsel

Foyt contends that his trial counsel erred by failing to interview Lauren Cano, who was the state's main witness against him. Dkt. 1 at 7. Foyt notes that defense investigator Rudy Vargas interviewed Lauren's parents on multiple occasions, but that he did not interview Lauren. Dkt. 2 at 8; Dkt. 30 at 1-2. By failing to interview her before trial, Foyt contends that his trial counsel was caught "flat footed" during cross-examination because Lauren "brought in additional testimony that was not in her original statement [to police]." Dkt. 1 at 7.

A criminal defendant's ineffective-assistance claim is analyzed under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim under *Strickland* a defendant must demonstrate that (1) his counsel's performance was deficient and (2) actual prejudice as a result of the

alleged deficiency.  *See id.* at 687-88, 690; *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000).  This inquiry is "highly deferential" to counsel.  *See Anaya v. Lumpkin*, 976 F.3d 545, 551 (5th Cir. 2020).   A federal habeas corpus court must also afford deference to a state court's adjudication under the AEDPA.  *See id.*  As a result, federal habeas review of a state prisoner's ineffective-assistance claim is "doubly deferential."  *Id.*; *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013) (requiring federal courts to use a "doubly deferential" standard of review for ineffective-assistance claims by giving "both the state court and the defense attorney the benefit of the doubt").

The Supreme Court has emphasized that *Strickland's* first prong "sets a high bar." *Buck v. Davis*, 580 U.S. 100, 118 (2017). To demonstrate deficient performance "the defendant must show that counsel's representation fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688.  When reviewing an attorney's performance a reviewing court must recognize that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Id.* at 690.   To succeed in establishing deficient performance a defendant must demonstrate an error "so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687.  But the Sixth Amendment guarantees only "reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam)

(citations omitted). "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Richter*, 562 U.S. at 110.

Even if it is established that counsel performed deficiently, to prevail a defendant still must show that he was prejudiced by counsel's errors. To establish the requisite prejudice "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A criminal defendant must "affirmatively prove prejudice." *Id.* at 693. A defendant cannot satisfy the second prong of *Strickland* with mere speculation and conjecture. *See Bradford v. Whitley*, 953 F.2d 1008, 1012 (5th Cir. 1992). "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

Foyt contends that his trial counsel was deficient because he failed to conduct an adequate pretrial investigation by interviewing Lauren Cano and that this error prejudiced his defense because counsel was unprepared for cross-examination. Dkt. 1 at 7; Dkt. 2 at 10. Counsel has a duty to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Escamilla v. Stephens*, 749 F.3d 380, 388 (5th Cir. 2014) (citing *Strickland*, 466 U.S. at 690-91). Decisions about the course of an investigation and the conduct of cross-examination are matters of trial strategy,

22/ 34

which are entitled to substantial deference on collateral review.  *See Strickland*, 466 U.S. at 689.  Counsel is entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.  *Richter*, 562 U.S. at 107.

Pleadings submitted by Foyt in state court provide additional context for his claim that counsel failed to conduct an adequate pretrial investigation.  Foyt points in particular to testimony given by Lauren Cano about her meeting with Foyt in person on Mother's Day 2016, shortly before Foyt left for Colorado, in which Foyt told her that the victim "gasped for air" and clung to life after being shot.  Dkt. 28-11 at 38.  Lauren admitted during her testimony that she made no mention of this in-person meeting during her statement to police.  *Id.*  Because trial counsel had reviewed Lauren's statements to law enforcement, but did not interview her before trial, Foyt contends that his attorney was surprised by the testimony.  Dkt. 28-1 at 78.

The trial record reflects that Lauren was reluctant to come forward with information about Foyt, whom she became involved with when she was 15, because she still cared for him.  Dkt. 26-6 at 228, 230.  The record contains the following exchange between defense counsel and Lauren, who was 20 when the trial took place, regarding the fact that she never mentioned meeting with Foyt on Mother's Day in her written statement to police:

> Q.  Would you agree with me that a lot of the things you've testified to today are not in that written statement?

A.  What do you mean?

Q.  A lot of – a lot of the facts and testimony that you gave here today are not contained in your written statement.

A. Yeah.  Like meeting him and stuff.  It's not there.

Q.  Right.  Did you ever have an opportunity to explain that to anybody?  So today is the first time we're hearing it?

A. No.

Dkt. 26-6 at 239-40.  Lauren explained that she was reluctant to disclose the in-person meeting during her initial interview with a detective because she didn't want her husband to find out.  *Id*. at 227-28, 245.  The record reflects that Lauren's husband, who was her boyfriend at the time the interview took place, was present when she gave her statement to police.  *Id*. at 56, 135.

Outside of the jury's presence, defense counsel pointed to Lauren's testimony about meeting with Foyt on Mother's Day and argued that the state failed to disclose this information in violation of the "Michael Morton Act," citing Article 39.14 of the Texas Code of Criminal Procedure.  Dkt. 26-7 at 9-10.  Defense counsel argued the state knew about the meeting on Mother's Day and that Lauren's written statement was incomplete, but didn't disclose the information as required.  *Id*. at 10-11.  Counsel argued that the lack of disclosure hampered cross-examination of the lead investigator about the accuracy of Lauren's written statement and the cross-examination of Lauren because it made defense counsel look like he was "flat footed or confused at hearing some of the things she was

saying for the first time." *Id.* at 11. Defense counsel argued that the failure to disclose was particularly prejudicial because Lauren would not cooperate with their efforts to investigate. *Id.* Therefore, defense counsel moved for a mistrial. *Id.* at 12. The trial court denied the motion, noting that both the lead investigator and Lauren Cano remained subject to recall for additional cross-examination and that the defense had additional time to prepare over a three-day weekend. *Id.* at 16. The defense did not recall either witness. Instead, defense counsel argued during summation at the close of the guilt/innocence phase of the trial that Lauren's changing story meant that she was not credible. Dkt. 26-12 at 82-83, 104.

Foyt's lead trial attorney provided an affidavit in response to Foyt's ineffective-assistance claim on state habeas corpus review and denied that the case was investigated inadequately. Dkt. 28-11 at 86. Counsel noted that the defense investigator, Rudy Vargas, interviewed Lauren Cano's parents on multiple occasions in an effort to speak with their daughter. *Id.* To the extent that Lauren's testimony at trial added relevant facts that were not previously disclosed to the defense, Lauren acknowledged during her testimony that her statement to law enforcement was incomplete. *Id.* Counsel explained that the objections that he raised following her testimony were designed to preserve error for a potential appeal and not a sign that he was actually "flat-footed or confused" due to a less than thorough investigation. *Id.*

The state habeas corpus court rejected Foyt's contention that his trial

attorney was ineffective, finding that counsel did not fail to conduct an adequate

investigation and that the trial was handled properly:

> (4) The case was fully investigated and prepared for a jury trial. The defense hired a private investigator[, Rudy] Vargas, who interviewed the Canos on August 19, 2017, August 20, 2017, October 7, 2017, December 17, 2017, December 18, 2017, December 29, 2017, December 30, 2017, and December 31, 2017. Even with the detailed investigation done in this case, there was no guarantee that anyone, such as the Canos, would cooperate.

> (5) Lauren Cano testified, however, that her statement to an investigator was not complete. She also testified about another interview with the district attorney's office in the lead-up to the jury trial the contents of which trial counsel claims were not disclosed to the defense.

> (6) Trial counsel claims that the contents of Lauren's statement added relevant facts that were not disclosed to the defense. Accordingly, the defense did what was necessary to preserve the issue for appeal. Nobody was flat-footed or confused. The defense . . . simply made a record for the appeal.

> (7) Due to the alleged violations of article [39.14] of the Code of Criminal Procedure and *Brady v. Maryland*, the defense moved for a mistrial which the Court denied. All of this was proper. And the matter was litigated during the appeal.

> (8) The trial was handled properly. All appellate matters were timely filed and properly preserved at trial. Nothing was neglected, and the trial was handled within the guidelines and applicable rules for professional conduct.

Dkt. 28-11 at 69-70. Consistent with the *Strickland* standard, the state habeas

corpus concluded that trial counsel was not deficient and that there was no

evidence that the alleged deficient performance prejudiced Foyt's case. *Id.* at 71.

The state habeas corpus court's findings and the implicit determination that

trial counsel's affidavit was credible are entitled to the presumption of correctness found in the AEDPA, 28 U.S.C. § 2254(e)(1).  *See Pippin v. Dretke*, 434 F.3d 782, 792 (5th Cir. 2005) ("A trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are 'virtually unreviewable' by the federal courts.") (citation omitted); *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (2001) (observing that the presumption of correctness applies to both explicit findings of fact and implicit unarticulated findings necessary to support a state court's conclusions of mixed law and fact). The presumption of correctness is "especially strong" where, as here, "the state habeas court and the trial court are one in the same."  *Mays v. Stephens*, 757 F.3d 211, 214 (5th Cir. 2014) (citing *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000)).

The state court's finding that Foyt's case was fully investigated in a manner consistent with professional norms is supported by trial testimony from the defense investigator, Rudy Vargas, who explained that he made numerous attempts to interview Lauren Cano, but that her father would not allow him to speak with her or provide her phone number.  Dkt. 26-11 at 174-79, 183, 186-88. Lauren's father, who was a former police officer, also testified at trial and explained that his daughter had a newborn infant during the time that Vargas was seeking to interview her and that the process had been tough on the family.  Dkt. 26-6 at 173-75, 189.  Vargas acknowledged that it was a sensitive situation because Lauren had

been pregnant and that she was also dealing with a previous loss. Dkt. 26-11 at 171. Vargas understood that these were the reasons her father would not cooperate or allow him to contact her directly and he did not want to "step on any toes" or alienate the witnesses. *See id.* at 180-83, 190.

Foyt insists that Vargas could have contacted Lauren directly because her phone number was in her written statement to police. Dkt. 30 at 1 (pointing to her written statement at State's Exhibit 33); Dkt. 31 at 8 (same). When confronted with this question at trial, Vargas admitted that he reviewed all of the police reports, but was unaware that Lauren's phone number was included in her statement. Dkt. 26-11 at 184. This oversight does not change the fact that Vargas attempted to speak with Lauren several times, but was unable to obtain her parent's cooperation. Nor does it establish that Foyt's defense counsel failed to conduct a reasonable investigation. In that regard, Foyt does not deny that he met with Lauren on Mother's Day 2016 or that he made inculpatory statements during that meeting. As the respondent notes, Foyt could have relayed this information to his counsel. Dkt. 24 at 33. "In general, counsel is not ineffective for failing to discover evidence about which the defendant knows but withholds from counsel." *Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir. 1997); *see also Randle v. Scott*, 43 F.3d 221, 225 (5th Cir. 1995) ("The scope of the attorney's duty to investigate may be limited by a defendant's lack of cooperation.").

Even assuming that defense counsel's investigation was inadequate to

uncover information about the Mother's Day meeting, the record shows that counsel used the gap between Lauren's trial testimony and her written statement to Foyt's advantage during closing argument by using Lauren's changing story to attack her credibility. Dkt. 26-6 at 239-40; Dkt. 26-12 at 82-83, 104. The record confirms that Foyt's trial attorneys capably cross-examined the state's witnesses and mounted a vigorous defense on his behalf. Given the amount of evidence against him, Foyt fails to establish that he was prejudiced by the defense investigator's failure to interview Lauren before trial. More importantly, Foyt does not show that the state court's decision to reject his ineffective-assistance claim was unreasonable. Because Foyt does not demonstrate that he was denied effective assistance of counsel at his trial, he is not entitled to relief on this claim.

### C.    Ineffective Assistance of Appellate Counsel

Foyt contends that his appellate counsel was deficient by failing to properly argue his claim that the evidence was insufficient to support his conviction. Dkt. 1 at 8. A claim of ineffective assistance on appeal is also governed by the test set out in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires the defendant to establish both constitutionally deficient performance and actual prejudice. *See Smith v. Murray*, 477 U.S. 527, 535-36 (1986). To establish that appellate counsel's performance was deficient in the context of an appeal, the defendant must show that his attorney was objectively unreasonable in failing to find arguable issues to appeal "that is, that counsel unreasonably failed to discover non-

frivolous issues and raise them." *Smith v. Robbins*, 528 U.S. 259, 285 (2000). If the defendant succeeds in such a showing, then he must establish actual prejudice by demonstrating a "reasonable probability" that, but for his counsel's deficient performance, "he would have prevailed on his appeal." *Id.*

As discussed above, the issue of whether there was sufficient evidence was litigated at length during Foyt's direct appeal, where the appellate court also considered Foyt's *pro se* supplemental brief. *See Foyt*, 602 S.W.3d at 35 n.1. Appellate counsel filed a 78-page appellate brief, which raised seven points of error and included an argument that the evidence was insufficient to show that Foyt was the man who killed Alexander. Dkt. 27-16 at 47-54. Counsel also challenged the sufficiency of the evidence in a petition for discretionary review filed on Foyt's behalf. Dkt. 28-4 at 17-18.

Foyt argues that his appellate counsel was deficient for failing to argue that his conviction was unsound because the state failed to prove the time and place of Alexander's death. Dkt. 1 at 8; Dkt. 2 at 10-16. This is an issue that Foyt presented on direct appeal in his *pro se* supplemental brief. Dkt. 28-2 at 18. The state habeas corpus court found that Foyt failed to show that his appellate counsel was ineffective, noting that appellate counsel raised six separate arguments in support of his challenge to the sufficiency of the evidence in Foyt's case. Dkt. 28-11 at 70-71. Appellate counsel is not deficient for not raising every non-frivolous issue on appeal. *See Ries v. Quarterman*, 522 F.3d 517, 531–32 (5th Cir. 2008); *Schaetzle*

*v. Cockrell*, 343 F.3d 440, 445 (5th Cir. 2003). "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983). Thus, "[d]eclining to raise a claim on appeal . . . is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court." *Davila v. Davis*, — U.S. —, 137 S. Ct. 2058, 2067 (2017).

As for Foyt's proposed claim about the state's failure to prove time and place of death, he fails to show that this argument has merit. In Texas, the state is not required to prove the cause of death, time of death, or location of death to satisfy the elements of a murder charge. *See Reeves v. State*, 969 S.W.2d 471, 479 (Tex. App. — Waco 1998, pet. ref'd). "When the evidence adduced at trial leaves uncertain the means used or the precise cause of the death of the deceased but creates no doubt that the deceased was killed by the acts of the accused, it is sufficiently proved." *Id.* (citing *Clark v. State*, 151 Tex. Crim. 383, 384-85, 208 S.W.2d 637, 638 (1948)). Foyt does not show that the result would have been different if counsel had raised this issue on appeal or that his performance was deficient. Because he has not otherwise shown that the state court's adjudication of this issue was unreasonable, Foyt is not entitled to relief on his claim that he was denied effective assistance on appeal. Accordingly, Foyt's petition will be denied and the respondent's motion for summary judgment will be granted.

## IV.    <u>REQUEST FOR EVIDENTIARY HEARING</u>

Foyt has filed a motion for an evidentiary hearing on his claims, reasoning that one is necessary because the state habeas corpus court did not hold one.  Dkt. 32 at 7; Dkt. 35 at 2.  However, state courts are not required to hold evidentiary hearings in habeas corpus proceedings and may resolve factual disputes based on written affidavits if the record supports such a determination.  *See Ellis v. Collins*, 956 F.2d 76, 79 (5th Cir. 1992).  Where a petitioner has failed to develop the factual basis of his claim during state-court proceedings, the AEDPA precludes an evidentiary hearing on federal review unless: (1) a petitioner's claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) the petitioner establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. 28 U.S.C. § 2254(e)(2).  When the state-court record is adequate to preclude relief under 28 U.S.C. § 2254(d), "a district court is 'not required to hold an evidentiary hearing.'" *Pinholster*, 563 U.S. at 183 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)).

Foyt does not attempt to show that he meets the criteria for an evidentiary hearing under 28 U.S.C. § 2254(e)(2) and he does not demonstrate that his state habeas corpus proceeding was inadequate to develop the record.  "A district court may refuse an evidentiary hearing where there is not a factual dispute which, if resolved in the prisoner's favor, would entitle him to relief." *Coleman v. Vannoy*,

963 F.3d 429, 435 (5th Cir. 2020) (citation and internal quotations omitted). Foyt has identified no such dispute. Because the court has been able to resolve the pending motion for summary judgment and all of Foyt's claims for relief on the existing state-court record, Foyt's motion for an evidentiary hearing, Dkt. 32, will be denied.

## V.    **CERTIFICATE OF APPEALABILITY**

Rule 11 of the Rules Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order that is adverse to the petitioner. A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "'that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Under the controlling standard, a petitioner must show "that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S. 100, 115 (2017) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)).

After careful review of the pleadings and the applicable law, the court concludes that reasonable jurists would not find its assessment of the claims

debatable or wrong. Because the petitioner does not allege facts showing that his claims could be resolved in a different manner, a certificate of appealability will not issue in this case.

## VI.   CONCLUSION AND ORDER

Accordingly, the court **ORDERS** as follows:

1. The respondent's motion for summary judgment, Dkt. 24, is **GRANTED** and the habeas corpus action filed by Zachary Foyt is **DISMISSED** with prejudice.

2. The petitioner's motion for judicial notice, Dkt. 30, is **GRANTED**. All the petitioner's other motions, Dkts. 29, 32, and 33, are **DENIED**.

3. A certificate of appealability is **DENIED**.

**The clerk will provide a copy of this order to the parties of record.**

Signed on Galveston Island this _19th_ day of _January_____, 2023.

_____
JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE

34/ 34